# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STUDIO 159, LLC, a Connecticut limited liability company, | Case No. CV 12-7127-RGK (JEMx) |
| Plaintiffs, | **MEMORANDUM AND ORDER RE: APPLICATION FOR RIGHT TO ATTACH ORDER AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT AGAINST NEXTPOINT, INC. (Docket Nos. 24 and 32); APPLICATION FOR RIGHT TO ATTACH ORDER AND ORDER FOR ISSUANCE OF WRIT OF ATTACHMENT AGAINST POPHANG, LLC (Docket Nos. 25 AND 33); REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF (Docket No. 16)** |
| v. | |
| POPHANG, LLC, a Delaware limited liability company; and NEXTPOINT, INC., a Delaware corporation, | |
| Defendants. | |

## I.     INTRODUCTION

On October 29, 2012, Plaintiff Studio 159, LLC, filed Applications for Writs of Attachment against Defendants Pophang, LLC ("Pophang"), and NextPoint, Inc. ("NextPoint"). Plaintiff seeks an attachment order for $1,070,170.23 as the remainder due on the sale of internet websites pursuant to an Asset Purchase Agreement signed on February 10, 2012. Plaintiff's application for right to attach orders and for writs of attachment in the amount above are **GRANTED**.

## II.    BACKGROUND

Plaintiff Studio 159, LLC, a Connecticut limited liability company, owned several internet websites, including damnyouautocorrect.com ("DYAC"). (Declaration of Jillian

Smith, ¶ 2.) Studio 159, LLC's sole member is Jill Smith, aka Jillian Madison. (Smith Decl., ¶ 1.)

Defendant NextPoint, Inc., a Delaware corporation doing business as Break Media, is, according to its Chief Financial Officer Andrew Doyle, "a leading creator, publisher and distributor of digital entertainment content [including] the largest humor website online — Break.com." (Declaration of Andrew Doyle, ¶ 2.) Defendant Pophang, LLC, is a Delaware limited liability company owned and created by NextPoint to acquire the websites owned by Smith. (Doyle Decl., ¶ 11.)

On February 10, 2012, Plaintiff and NextPoint entered into an Asset Purchase Agreement ("Agreement") pursuant to which Plaintiff sold to Pophang a suite of 22 internet websites ("Sites"), including the DYAC site, for $2.5 million, $1.5 million to be paid on the Closing Date and a $1 million Deferred Payment six months after the Closing Date. (Smith Decl., ¶ 4, Ex. A; Doyle Decl., ¶ 10.) In Section 2.1.3 of the Agreement, NextPoint guaranteed the prompt payment and performance by Pophang. (Smith Decl., ¶ 9, Ex. A.)

Pursuant to Section 10.4 of the Agreement, Defendants had the right to set off against the Deferred Payment any amount Plaintiff was obligated to indemnify Defendants in accordance with the Agreement. Sections 10.1, 10.1.1 and 10.1.2 obligate Plaintiff and Smith to indemnify NextPoint for any loss suffered from any breach of representation or warranty contained in any Transaction Document, or any failure to perform any covenant or condition imposed in any Transaction Document.

There is no dispute that, subsequent to the February 10, 2012, Closing Date, traffic to the websites Plaintiff sold Defendants declined. This prompted Defendants not to make the $1 million Deferred Payment due on August 10, 2012. On that date, Pophang, LLC, sent a letter to Plaintiff stating that it was exercising its right to set off the entire amount of the Deferred Payment. (Smith Decl., ¶ 8, Ex. B.) The letter states that Plaintiff is in breach of representations contained in Sections 3.6 and 3.11, "as evidenced by the immediate and dramatic drop in traffic to the sites following the Closing." (Id.) Section 3.6.1 represents that there are no paid traffic purchase agreements other than as disclosed (none were) and

2

Section 3.11 represents that Seller has not made any untrue statement of material fact or omitted to state any material fact. Put simply, Defendants contend that Plaintiff manipulated traffic to its websites before the Closing Date in order to command an artificially high purchase price for them.

On August 17, 2012, Plaintiff sued Defendants for breach of contract and breach of guaranty, in the amount of not less than $977,257.89. (Complaint, ¶¶ 54, 63.) This amount is calculated by offsetting against the $1 million Deferred Payment owed to Plaintiff less $22,272.11 in revenue from the Sites collected by Plaintiff for Defendants after the Closing Date. (Id.) Section 10.4 of the Agreement provides that, if Buyer exercises a right of offset without justification, Buyer shall be liable to Seller for interest on the Deferred Payment at the rate of 10% per annum from the Closing Date until fully paid. With interest and attorneys' fees and costs permitted by statute, the amount of the attachment sought by Plaintiff is $1,070,170.23.

Defendants filed an Answer on October 14, 2012, denying the allegations of Plaintiff's complaint. Defendants also asserted the affirmative defenses of estoppel, unclean hands, justification, non-performance, fraud in the inducement, and mistake of fact.

After Plaintiff filed its Applications for Writ of Attachment on October 29, 2012, Defendants filed an Opposition on November 16, 2012. Plaintiff filed a Reply on November 27, 2012.

Defendants filed a Motion to Strike evidence raised for the first time in Plaintiff's Reply. On December 3, 2012, the Court issued an order permitting Defendants to respond to the new evidence raised for the first time in Plaintiff's Reply and requiring both parties to clarify certain issues left unclear by the briefing. The parties filed supplemental responses on December 10, 2012.

The matter is now ready for decision.[1]

---

[1] Plaintiff filed a Request for Judicial Notice ("RJN"), which Defendants oppose. Defendants filed numerous objections to Plaintiff's declarations and evidence. The Court's ruling does not rely on the RJN or on most of the evidence subject to objection and, thus,

3

## III. LEGAL STANDARDS

Fed. R. Civ. P. Rule 64(a) provides that "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Remedies available under this rule include attachment. Rule 64(b).

The effect of Rule 64 is to incorporate state law to determine the availability of prejudgment remedies for the seizure of property to secure satisfaction of a judgment ultimately entered. Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Co., 415 U.S. 423, 436 n.10 (1974); Blastrac, N.A. v. Concrete Solutions & Supply, 678 F. Supp. 2d 1001, 1004 (C.D. Cal. 2010). Thus, California Code of Civil Procedure §§ 481.010-493.060 provide the standards for prejudgment writs of attachment in this case.

Attachment "is a remedy by which a plaintiff with a contractual claim to money (not a claim to a specific item of property) may have various items of a defendant's property seized before judgment and held by a levying officer for execution after judgment." Waffer Int'l Corp. v. Khorsandi, 69 Cal. App. 4th 1261, 1271 (1999) (emphasis omitted). California allows prejudgment attachments under limited circumstances as "a provisional remedy to aid in the collection of a money demand." Kemp Bros. Constr., Inc. v. Titan Elec. Corp., 146 Cal. App. 4th 1474, 1476 (2007). It is "a harsh remedy because it causes the defendant to lose control of his property before the plaintiff's claim is adjudicated." Martin v. Aboyan, 148 Cal. App. 3d 826, 831 (1983). Therefore, the requirements for the issuance of a writ of attachment are strictly construed against the applicant. Pos-A-Traction, Inc. v. Kelly-Springfield Tire Co., 112 F. Supp. 2d 1178, 1181 (C.D. Cal. 2000). The burden is on the applicant to establish each element necessary for an attachment order by a preponderance of the evidence. Loeb & Loeb v. Beverly Glen Music, Inc., 166 Cal. App. 3d 1110, 1116 (1985).

---

the RJN is moot and so are the objections, except in the few instances noted within.

A writ of attachment may be issued "only in an action on a claim or claims for money, each of which is based upon a contract, express or implied, where the total amount of the claim or claims is a fixed or readily ascertainable amount not less than five hundred dollars." Cal. Civ. Proc. Code § 483.010(a). Attachment is permitted on unsecured claims or claims secured by personal property, but not on claims secured by real property. Cal. Civ. Proc. Code § 483.010(b). Attachment lies on any claim against a partnership or corporation or on claims against individuals that arise out of the conduct by the individual of a trade, business, or profession. Cal. Civ. Proc. Code § 483.010(c).

Apart from these requirements, a Court must find all of the following before attachment may issue: (1) the claim upon which the attachment is based is one upon which an attachment may be issued; (2) the plaintiff has established the probable validity of the claim upon which the attachment is based; (3) the attachment is not sought for a purpose other than recovery of the claim upon which the attachment is based; and (4) the amount to be secured by the attachment is greater than zero. Cal. Civ. Proc. Code § 484.090(a).

In order to establish the "probable validity" component, the plaintiff must show it is more likely than not that it will obtain a judgment against the defendant. Cal. Civ. Proc. Code § 481.190; see also Pos-A-Traction, 112 F. Supp. 2d at 1182. "In determining the probable validity of a claim where the defendant makes an appearance, the court must consider the relative merits of the positions of the respective parties and make a determination of the probable outcome of the litigation." Loeb & Loeb, 166 Cal. App. 3d at 1120. Thus, it is not enough for the plaintiff to make out a prima facie case for breach of contract; rather, the plaintiff must also show that the defenses raised are "less than fifty percent likely to succeed." Pet Food Express, Ltd. v. Royal Canin USA Inc., 2009 WL 2252108, at *5 (N.D. Cal. July 28, 2009). If an applicant fails to rebut a factually-supported defense that would defeat its claims, the applicant has not established probable validity. See Intervest Mortgage Inv. Co. v. Skidmore, 2008 WL 5385880, at *7 (E.D. Cal. Dec. 19, 2008) ("[Plaintiff] argues that it may not be required to refute [defendant's] defenses, i.e., that probable validity on the prima facie case may be sufficient. The court disagrees.

Section 484.090 requires prediction of the probable outcome of the litigation, and the affirmative defenses and counterclaims will potentially influence this outcome."); Plata v. Darbun Enters., Inc., 2009 WL 3153747, at *7 (S.D. Cal. Sep. 23, 2009) (denying right to attach order because an asserted defense prevented the plaintiffs from establishing the probable validity of their claim).

**IV.     DISCUSSION**

There is no dispute that Defendants failed to make the Deferred Payment due on August 10, 2012. Plaintiff has made a prima facie case that Defendants breached the Asset Purchase Agreement and guaranty. The issue, then, is whether Plaintiff has established that Defendants' affirmative defenses are unlikely to succeed.

The starting point of any analysis of Plaintiff's performance under the Asset Purchase Agreement is Section 11.12, which provides as follows:

> Entire Agreement. This Agreement (including all the schedules and exhibits hereto), together with the certificates and other documentation referred to herein or required to be delivered pursuant to the terms hereof, contains the terms of the entire agreement among the parties with respect to the subject matter hereof and supersedes any and all prior agreements, commitments, understandings, discussions, negotiations or arrangements of any nature relating thereto (including without limitation, any exchange of emails between the parties on or prior to the Closing Date).

Defendants, then, may not create or impose any additional obligations or enforce any agreements or representations not contained within the Agreement.

Plaintiff, however, committed itself as follows in Section 3.11 of the Agreement:

> Full Disclosure. In connection with the transactions, Seller has not made any untrue statement of a material fact or omitted to state any material fact.

Defendants assert that Plaintiff violated Section 3.11 in regard to key representations in the Agreement.

**A.   Defendants' Claim Of Traffic Manipulation Is Unlikely To Succeed**

Plaintiff made the following representation of website traffic to the Sites in Section 3.6.4 of the Agreement:

> <u>Exhibit 3.6.4</u> lists, with respect to the Sites, as reported in Google Analytics ("GA") during the 6 month period ending on October 31, 2011, the number of "Page views" for the Sites.  Seller has properly installed GA on the Sites in accordance with industry standard installation instructions and has properly maintained the installation of GA on the Sites.  Seller is not aware that GA materially overstates the traffic for the Sites for such 6-month period.

Google Analytics ("GA") is a widely used service provided by Google, Inc., that generates and tracks visitor traffic to a website.  (Smith Decl., ¶¶ 9-12.)  Exhibit 3.6.4 lists the total number of page views for DYAC and the other websites sold to Defendants for the period May 1, 2011-October 31, 2011.  For DYAC, the total number of page views for that period was 211,175,774.  Smith also provided Defendants with website traffic data from several advertising sources, from her ComScore account and from the official Facebook page for the DYAC site.  (Smith Decl., ¶¶ 15, 17-18.)  Defendants admit that Smith provided the above website traffic information and that the visitor traffic numbers were as represented.  (Answer, ¶¶ 20-21; Pophang and NextPoint's Opposition to Plaintiff's Applications for Writ of Attachment, 4:13-20; Doyle Decl., ¶ 9.)  Defendants, however, contend that Smith engaged in techniques to manipulate and artificially boost visitor traffic to the Sites.

In particular, Defendants contend that Plaintiff engaged in traffic manipulation in breach of representations contained in Section 3.61 and 3.62 of the Agreement:

> **3.6 Site Traffic; User Submitted Content**
>
> *3.6.1 Exhibit 3.6.1(a)* lists, for the period from January 1, 2011 through the date of this Agreement, as available, (i) all keywords, traffic banners or search terms purchased by Seller relating to the Sites (ii) the source of any such purchase (i.e. Google, Burst Media, etc.), (iii) the price per

|   |   |
|---|---|
| 1 | keyword, traffic banner or other search term, and (iv) the average |
| 2 | monthly costs associated with parts (i) to (iv) above. Except as set |
| 3 | forth on *Exhibit 3.6.1(b)*, there are no paid or non-paid traffic purchase |
| 4 | agreements or other arrangements by which a Seller has purchased |
| 5 | any traffic directed to the Sites including by way of any barter |
| 6 | agreements such as link exchanges. Except as set forth on *Exhibit* |
| 7 | *3.6.1(c)* there are no paid or non-paid traffic purchase agreements, link |
| 8 | exchanges or other arrangements that if not continued by Buyer would |
| 9 | materially affect the Sites' historical monthly page views and/or unique |
| 10 | visitors. |
| 11 | *3.6.2 Exhibit 3.6.2* lists, for the period from January 1, 2011 through the |
| 12 | date of this Agreement, (i) all links purchased by Seller linking to or |
| 13 | appearing on the Sites, (ii) the source of such purchase, (iii) the price |
| 14 | per link, (iv) the date purchased, (v) the duration of such purchase, and |
| 15 | (vi) the average monthly costs associated with (i) to (v) above. |

Defendants contend that "the only explanation for the sudden and significant decrease in page views from DYAC following the Closing Date is that Smith engaged in activity that artificially inflated the page view data before she transferred ownership of the Sites." (Pophang and NextPoint's Opposition to Plaintiff's Applications for Writ of Attachment, 19:14-17.) Thus, claim Defendants, she breached the representations in Sections 3.61 and 3.62 by falsely stating that she had no arrangements that materially affected the Sites' page views and unique visitors. (Id. at 19:18-20.)

Defendants, however, present no evidence at all in support of their assertions of website traffic manipulation. Defendants explain how website traffic potentially can be inflated and assert that Plaintiff had motive and opportunity to boost and manipulate website traffic to increase the price she received for the Sites. Defendants, however, provide not one iota of evidence that Plaintiff purchased traffic or links not identified on the 3.61 and 3.62 Exhibits, nor present any undisclosed paid or non-paid traffic or link purchase

agreements. Defendants simply assume, without any evidence at all, that the decline in website traffic must be the result of traffic manipulation by Smith. That decline is insufficient by itself, however, to establish any misrepresentation or breach of the Agreement in the absence of any evidence of any conduct by Plaintiff before the Closing Date that might reasonably be expected to artificially inflate pre-Closing Date website traffic. Here, there is none. All defendants present for now is mere suspicion without any direct or circumstantial evidence of any misrepresentation or breach or fraud or traffic manipulation.

Although she bears no burden to explain or justify the post-Closing Date decline in website traffic, Ms. Smith offers several potential alternate explanations for the decline in web traffic other than traffic manipulation. (Smith Decl., ¶¶ 31-44.) These include a decline in post quality and quantity and a neglecting of feeder sites, redesign of the DYAC site to a less appealing format, increased competition from other websites and failure to follow instructions by Google Analytics when installing the tracking code (Smith original Declaration, ¶¶ 31-44); major changes to the structure and layout of the DYAC site to show only one entry at a time instead of five pre-Closing Date (Smith Supplemental Declaration); declarations from purported experts Wasserman, Bailey and Benson indicating nothing out of the normal in pre-Closing Date traffic and that public interest in "autocorrect" waned.

Smith also sent an email on March 14, 2012, criticizing Defendants' management of the Sites. (Complaint, ¶ 44, Ex. K.) Defendants' Associate Editor Earnest Pettie acknowledged in emails that "it did take me a while to find what resonated with both me and the audience for DYAC" (Complaint, ¶ 45, Ex. L) and that "the editor I put in charge of most of the tumblers had gone far off the rails, posting images that were neither fun nor funny." (Complaint ¶ 45, Ex. M.) Defendants admit Doyle received Smith's email (Answer, ¶ 44) and that Earnest Pettie sent the emails described above. (Answer, ¶¶ 45, 46.)

Defendants offer rebutting evidence and objections to some, but not all, of the potential explanations proffered by Smith for the decline in website traffic. Even though demonstrating Plaintiff's proof for the above explanations is insufficient to establish any of them as a cause of the decline in website traffic, Defendants did not disprove any of those

explanations or all possible explanations other than traffic manipulation. On the record before the Court, all that can be said is that there was a decline in website traffic, the reason(s) for that decline are unknown, and there are potential alternate explanations for the decline other than traffic manipulation. Defendants' contention that the only possible explanation for the decline in web traffic is traffic manipulation by Smith is unproven.

To fill the evidentiary void, Defendants claim that Ms. Smith refused the request of NextPoint CFO Andrew Doyle to provide access to historical website traffic volume data from her Google Analytics ("GA") account to compare post-Closing Date data with historical data. Doyle and Defendants assert Ms. Smith was obligated to provide such data pursuant to Section 11.9 of the Agreement. That section requires the parties to perform any acts the other party reasonably may request "to consummate and perfect the Transactions," which would include the Deferred Payment. Smith's alleged refusal, said Doyle, led him to consider whether Ms. Smith had misrepresented website traffic to the sites. (Doyle Decl., ¶ 19.)

Doyle's Declaration, however, provided no detail on his alleged request (date and whether by email, telephone or otherwise, and what exactly Ms. Smith said, if anything), nor did Doyle provide any documentation of the alleged conversation, such as by email. Ms. Smith's Supplemental Declaration in support of Plaintiff's Reply Brief did not directly address or deny Doyle's assertion but did state that she complied with numerous requests for her Google Analytics account and for historical data. To obtain clarification of this inconsistency, the Court ordered both parties to file supplemental declarations on the alleged conversation, when it occurred, and what exactly was said.

The supplemental declarations establish that Defendants seriously distorted the true facts and omitted relevant material facts bearing on their access to Ms. Smith's GA account. Ms. Smith repeatedly provided Defendants access to her GA account both before and after the Closing Date. Ms. Smith's original declaration states that she granted access to her GA account to Mr. Doyle and to NextPoint CEO Keith Richman in September 2011. (Smith Decl., ¶ 14.) Defendants do not dispute these facts; in fact, Defendants admit Doyle and

others had access.  (Answer, ¶ 20; Doyle Decl., ¶ 9; Supplemental Declaration of Earnest Pettie, ¶ 3; Supplemental Declaration of Andrew Doyle, ¶ 3.)  Subsequent to the Closing Date, Ms. Smith gave personal log-in access to her GA account for all websites to NextPoint employees Earnest Pettie, Sang Kim and Garry Zakharian, who had the ability to retain whatever historical data they wanted from Smith's entire GA account.  (Second Supplemental Declaration of Jill Smith, ¶¶ 7-11, 13.)  These facts too are not disputed; in fact, Defendants now admit these three employees were given access to Smith's GA account.  (Defendants' Response to Plaintiff's Reply Brief, pp. 6-7; Doyle Suppl. Decl., ¶ 3; Pettie Suppl. Decl., ¶ 4.)  Ms. Smith also states that Doyle never personally requested access for himself after the Closing Date.  (Smith Second Suppl. Decl., ¶¶ 12-13.) Mr. Doyle's own Supplemental Declaration makes clear that he never requested access for himself after the Closing Date and admits that Smith gave several NextPoint employees access to her GA account post-Closing.  (Doyle Suppl. Decl., ¶¶ 3-6.)

       What Doyle and Defendants now claim is that, sometime in early April, Smith stopped responding to requests for access, but the evidence for this assertion is murky and weak. Zakharian and Kim provided no declarations that their access had been revoked, and Earnest Pettie claims he did not need his access renewed in April but claims Kim requested it in mid-April and it was not provided.  (Pettie Suppl. Decl., ¶ 5.)  Smith has not had an opportunity to respond to this assertion.  Even accepting that she did not grant access to Kim again, Defendants had full access to Smith's GA account continuously before and after the Closing Date and could have retained any information they thought relevant.  The true facts, then, are a far cry from the impression Defendants and Mr. Doyle initially tried to present before the Court required further clarification of the inconsistency between Doyle's and Smith's previous declarations.

       The Court concludes that Smith's alleged refusal to provide access to her GA account is a red herring that goes nowhere and proves nothing. There is no dispute Ms. Smith granted repeated requests for access to her GA account before and after the Closing Date.  Defendants plainly had sufficient access to Smith's GA account and

Defendants did not even request access to Ms. Smith's GA account in their August 10, 2012 letter. Defendants could have retained the historical data and may even have done so or chose not to do so. Nor do Defendants demonstrate how any restriction on Kim's access has any bearing on anything or is evidence of traffic manipulation. There was no breach of Section 11.9 of the Agreement.

Unable to establish that pre-Closing Date GA traffic numbers were not as represented or contained irregularities suggestive of manipulation, Defendants in their August 10, 2012 letter for the first time requested the server log data for the Sites for the period prior to the Closing Date. (Smith Decl., Ex. B.) Defendants assert that the server logs contain more complete information than the GA data and may be a better source of information for determining if Smith manipulated traffic to the Sites. (Kennard Decl., ¶¶ 12-16.) Smith, however, reports that the logs were written over because of an automated server process called log rotation and no longer exist. (Smith Suppl. Decl., ¶ 23.) Christian Dawson, COO of webhost Servint Corporation for the DYAC site through February 2012, indicates that the server logs no longer exist. (Declaration of Christian Dawson, ¶¶ 3-5.) He also indicates that server logs frequently are written over with new data and, once this happens, there is no way to get previous information from the server logs back. (Id., ¶ 5.) In his Supplemental Declaration, Defendants' expert Paul Kennard, who stated he needed the server logs, did not dispute Dawson's contention that server logs frequently are overwritten. The server logs were never in Smith's possession or written over by her, but by Servint after Smith no longer owned the DYAC site. The Agreement, moreover, makes no reference to server logs. Defendants do not explain why they did not request the server logs when doing their due diligence before the sale was consummated, or at least request that Smith obtain and preserve them. Defendants attempt to imply that Smith caused the loss of the server logs, but this would require the Court to find that both Smith and Dawson perjured themselves. The loss of the server logs provides no basis for any inference Smith manipulated traffic to the Sites.

The Court's December 3, 2012, minute order permitted Defendants to respond to the declarations of Bailey, Wasserman, Benson, and Dawson and directed them to clarify their access to Smith's GA account. Defendants went further and asserted for the first time that Smith deleted her Google Webmaster Tools after the Closing Date. (Declaration of Josh Elcik, Ex. B.) According to Kennard, Google Webmaster Tools is a no-charge web service offered by Google that may inform webmasters if any suspicious activity has occurred on their websites. (Kennard Decl., ¶ 11.) Smith has had no opportunity to respond to this issue. Kennard's conclusory statement that "it is highly unusual for a website administrator to delete its Google Webmaster Tools account" (id.) is without any foundation and does not address whether it would be unusual to delete a Google Webmaster Tools account for a website the administrator no longer owns or controls. The Agreement makes no reference to the Google Webmaster Tools account and Defendants do not explain why they did not request access to this account during their due diligence before the sale was consummated or at least request that Smith obtain or preserve the account. The deletion of the Google Webmaster Tools account provides no basis for any inference that Smith manipulated traffic to the Sites.[2]

Plaintiff has stated under oath subject to penalty of perjury that she "never took any action to fabricate hits," "never had any link exchanges or marketing agreements," "did not purchase any traffic or keywords at anytime," and "did not purchase any traffic banners or

---

[2] NextPoint portrays itself as a sophisticated distributor of online humor. It had months of access to Google Analytics historical data and other information before the sale for purposes of due diligence. In Section 11.15 of the Agreement, all parties acknowledged that they had adequate time to consider the Agreement and have it reviewed by legal counsel. The parties chose in Section 3.6.4 of the Agreement to make GA historical data the measure of website traffic. The accuracy of the GA pre-Closing Date traffic volume is conceded. Although server log and Webmaster Tools account data are legitimate discovery objectives, their loss does not constitute a breach of the Agreement or provide a basis for inferring traffic manipulation. Defendants cannot fairly judge Ms. Smith by measures which do not appear in the Agreement and which Defendants never considered themselves much less valued or requested until months after the Closing Date when they hired Mr. Kennard as an expert. Defendants never acknowledge or accept responsibility for the role their own behavior played in the loss of server log and Webmaster Tools data.

search terms or enter into any traffic purchase agreements, consistent with my representations in the Agreement." (Smith Suppl. Declaration, ¶¶ 4, 10). Defendants, in effect, are accusing Ms. Smith of perjury, but fail to produce any evidence at all that Ms. Smith manipulated website traffic before the Closing Date or misrepresented or breached Sections 3.6.1, 3.6.2, 3.6.4, 3.11, or 11.9 of the Agreement. The Court, therefore, concludes on the basis of the current record that none of Defendants' affirmative defenses predicated on manipulation of pre-Closing Date website traffic in violation of the above sections of the Agreement is likely to succeed.

### B. Defendants' Claim That Plaintiff Misrepresented The Number Of User Submissions Is Unlikely To Succeed

Defendants' August 10, 2012, letter declining to make the Deferred Payment makes no mention of user submitted content. In their Opposition to the Plaintiff's Applications for Writ of Attachment, however, Defendants contend for the first time that "Smith breached Section 3.6.4 by misrepresenting the average number of User Submitted Content to DYAC on a daily basis." Section 3.6.4 provides as follows:

> The number of submissions of User Submitted Content to http://DamnYouAutocorrect.com by users unrelated to Seller and Smith has, on an average basis, exceeded 150 per day for the period from January 1, 2011 through November 30, 2011.

After Defendants assumed control of the Sites, they received but 100 user submissions daily. Defendants claim that Smith represented that all the posts to DYAC were user submitted and not the product of fake texts created by Smith. Defendants contend that the lower than expected number of user submissions after the Closing Date and the low quality of the submissions received "strongly suggests" that Smith had been creating fake texts and posting them on DYAC to boost page views.

Smith, however, presents data consistent with the representation in Section 3.6.4 of the Agreement that the DYAC site received an average of 150 submissions a day. (Smith Supplem. Decl., ¶¶ 7-8.) This information was provided to Defendants prior to the Closing

1 Date, and Defendants did not dispute the pre-Closing Date data. Plaintiff also submitted to
2 Defendants before the Closing Date the exact submissions as sent in by readers (including
3 all headers and personally identifiable information) to allow Defendants to verify their
4 authenticity. Id. Smith's Supplemental Declaration is made on personal knowledge under
5 oath subject to penalty of perjury. Defendants filed objections to some paragraphs in
6 Smith's Declaration (¶¶ 14, 17, 18, 19, 20), but not to paragraphs 7 and 8. Defendants, in
7 effect, accuse Smith of perjury, but there is no evidence at all supporting an inference that
8 Smith misrepresented the average number of pre-Closing Date user submissions or that
9 she posted fake user submissions.

10 The mere fact that user submissions were lower after the Closing Date is insufficient
11 by itself to establish any misrepresentation or breach of Section 3.6.4. As Smith notes, she
12 never made any representations about what the quality or number of user submissions
13 would be after the Closing Date. (Smith Suppl. Decl., ¶ 9.) Smith no longer had control of
14 the Sites after the Closing Date.

15 The Court therefore concludes on the basis of the record before it that none of
16 Defendants' affirmative defenses predicated on misrepresentation of the number of pre-
17 Closing Date user submissions or use of fake user submissions in violation of Section 3.6.4
18 of the Agreement is likely to succeed.

### C. Defendants' Claim That Plaintiff Breached Her Post-Closing Date Obligation To Cooperate Under Section 6.3.1. Is Unlikely To Succeed

Defendants make a weak argument that Smith breached her duty under Section 6.3.1 of the Agreement to cooperate in the transition of the Sites to NextPoint's control. Section 6.3.1 provides as follows:

> Until such time as the transition has been completed but in no case later than forty-five (45) days after the Closing Date (the "Transition Period"), and for <u>no more than fifteen (15) hours per week</u>, (a) Seller will reasonably cooperate with Buyer in continuing to maintain and operate the Sites <u>as reasonably directed by Buyer</u> . . .

15

(Emphasis added.) Smith no longer had control over the Sites after the Closing Date. Anything she did on the Sites would require request and direction by the Buyer. She was not required to give 15 hours a week, only up to 15 hours a week if so required by the Buyer.

Mr. Doyle claims that, except for one memo criticizing NextPoint's management of the DYAC site, Smith did virtually nothing to meet her obligations under Section 6.3.1 and spent no more than 2 hours a week assisting the transition. (Doyle Decl., ¶ 18.) Doyle's Declaration does not acknowledge that NextPoint's direction was required nor does he identify assigned projects that would have resulted in 15 hours of work per week that Smith failed to perform. Ms. Smith in her original Declaration states that her services were greatly underutilized, and Defendants rarely requested her assistance. (Smith Decl., ¶ 34.) As Doyle acknowledged, Smith sent an email identifying an extensive list of problems she perceived in Defendants' management of the Sites. (Id., ¶ 36.) In her Supplemental Declaration, Smith details her assistance to NextPoint employees Charles Gough, Josh Elcik, Yen Weng, and Earnest Pettie. (Suppl. Decl., ¶¶ 16-17.) She offered to assist after she received complaints from readers, but never received a response from Defendants. (Id., ¶ 18.) Smith states that Defendants never asked her to be more proactive, never informed her they were unhappy with her services before August 10, 2012, and even tried to hire her after the Closing Date. (Id., ¶¶ 13, 24.) Defendants do not dispute or object to Smith's testimony.

Doyle claims that, as part of her agreement to work on the Sites for 45 days, Smith agreed to pre-program new posts to be published to the DYAC site for the first 10 days after the Closing Date (Doyle, ¶¶ 13-14), but provides no documentary evidence to support this assertion. Smith states in her Supplemental Declaration, "I did not agree to pre-program DYAC with 10 days of material after the Closing Date. There was no stipulation in the Agreement requiring that I pre-program posts, nor was I ever directed to do so by Defendants. In fact, on February 9, 2012, I explicitly informed Doyle via email that I did not have anything scheduled to post after the Closing Date, to remind him that the burden of

16

posting after the Closing Date would fall squarely on Defendants." (Suppl. Decl., ¶ 14.) Defendants object to the admissibility of the email and Ms. Smith's statements about the email as hearsay, but Ms. Smith had personal knowledge of what she told Doyle, which serves to authenticate the email. FRE 901(b)(1).

The Court concludes on the basis of the record before it that none of Defendants' affirmative defenses predicated on failure to reasonably cooperate in Site transition in violation of Section 6.3.1 of the Agreement is likely to succeed.

**D.    Disposition**

Ms. Smith has submitted declarations under oath subject to penalty of perjury that she has performed her obligations under the Agreement. There is no dispute that Defendants did not make the Deferred Payment due on August 10, 2012. There is no dispute that the website traffic numbers for the Sites from Google Analytics and other sources are as they were represented. There is no evidence of traffic manipulation or misrepresentation of user submitted content or breach of transition assistance responsibilities. Discovery may yet produce evidence of traffic manipulation but, on the basis of the evidence in the record before it, the Court concludes that Plaintiff's claims for breach of contract and guaranty are probably valid, and Defendants' affirmative defenses and assertions of misrepresentations and breaches of the Agreement are unlikely to succeed. The record, as it currently stands, is more consistent with a scenario where NextPoint, fearing it made a bad deal and overpaid for the websites and seeing an opportunity to avoid making the Deferred Payment, chose to blame Ms. Smith for the decline in website traffic, accusing her of fraud and perjury without any evidence at all to support its suspicion of website traffic manipulation. The Court is reinforced in this conclusion by Defendants' frequent overstatement, distortion and omission of relevant, material facts, its reliance on irrelevant facts, events and issues outside the Agreement, and its failure to acknowledge its own potential responsibility for inadequate due diligence and possible mismanagement of the Sites.

Plaintiff, therefore, is entitled to right to attach orders and writs of attachment against Defendants. Plaintiff's Applications for Writ of Attachment and Right to Attach Order are **GRANTED** in the amount requested.

## ORDER

IT IS HEREBY ORDERED that Plaintiff's Applications for Writ of Attachment and Right to Attach Orders against Defendants Pophang, LLC, and NextPoint, Inc., are **GRANTED**.

**IT IS SO ORDERED**.

DATED: December 21, 2012          */s/ John E. McDermott*
                                   JOHN E. MCDERMOTT
                                   UNITED STATES MAGISTRATE JUDGE